HEARD NOVEMBER TERM, 1875.

## McCELVEY *vs.* THOMSON.

One cannot become a purchaser at a judicial sale where he has a duty to perform in reference thereto which is inconsistent with the character of purchaser.

A purchase, under a decree for sale of the Court of Equity, made by a solicitor in the cause for the benefit of himself and the Commissioner who made the sale, set aside, although no actual fraud was shown, and the purchasers held liable for the advanced price at which they had sold the land to a *bona fide* purchaser for value without notice.

BEFORE COOKE, J., AT ABBEVILLE, APRIL TERM, 1874.

The cases stated in the caption of the report of the Referee, herein contained, and also in the caption of the opinion of the Court, were entitled (1) *William McCelvey* vs. *W. D. Mars,* as assignee; (2) *William McCelvey* vs. *Thomas Thomson* and *W. H. Parker*; and (3) *Ex parte William McCelvey, in re William McCelvey* vs. *A. P. Conner and others.* They were referred to Silas Johnstone, Esq., as Referee, who submitted the following report, dated 22d April, 1873:

The undersigned, appointed by this Court a Referee to hear and determine the issues of fact and law in the above stated cases, respectfully submits the following report: The questions in these proceedings might properly be presented in a very few words; but inasmuch as every point that could be suggested was raised and strongly contested at the hearing on the reference, a full account of the causes may be expected; and I shall endeavor to state everything which may in any way tend to a fair investigation of the matters in controversy.

Hugh McCelvey, by his solicitor, Thomas Thomson, Esq., (one of the defendants above named,) instituted proceedings by bill filed 25th April, 1866, in the Court of Equity for Abbeville, against

William McCelvey, (the plaintiff herein,) and one A. L. Welch, for specific performance of a contract in relation to the sale of a tract of land, called the Clay tract. William McCelvey, by Mr. McGowan, his solicitor, answered, pleading full payment for the land to Samuel Jordan, attorney for Hugh McCelvey. Chancellor Johnson, at the hearing, June sittings, 1866, ordered an issue at law, "whether the money was received by Samuel Jordan from William McCelvey as an absolute payment of the note given for the purchase of the Clay tract;" and though somewhat in anticipation, it may be here stated that the trial of the issue resulted, 19th August, 1869, in finding the note paid. William McCelvey being greatly embarrassed by debt, believing himself utterly insolvent, made a voluntary assignment of all his estate, real and personal, to William D. Mars, the defendant above named, for the benefit of his creditors; the property, (including the Clay tract, which was then in litigation,) to be sold for cash, and the proceeds to be applied, after certain preferred creditors were paid, to the extinguishment of all of his debts. He then, within a few days thereafter, removed from this State.

A. P. Conner and Catlett Corley, being sureties for William McCelvey in a very large amount for the purchase of certain slaves, had procured from him a confession of judgment, to secure them, and immediately after the assignment above mentioned levied their execution on the assigned property. Thereupon Mars, assignee, filed his bill against them, to enjoin the sale under their execution, to reduce their judgment, (then amounting to $9,875,) and to marshal the assets of McCelvey. The injunction was granted 29th September, 1866, and on 7th November, 1866, Judge Wardlaw, Associate Justice, granted an order in both the cases above mentioned, *McCelvey* vs. *McCelvey*, and *Mars* vs. *Conner et al.*, directing the lands to be sold, (the proceeds of the Clay tract to await the event of the issue at law,) the creditors to be called in, and the assignee to account, giving leave to make William McCelvey, resident then in Texas, a party to the latter bill. A. L. Welch; a party defendant to the bill of *McCelvey* vs. *McCelvey*, then residing on the lands assigned by William McCelvey, and claiming to have purchased them from him before the assignment, had the sale made under Judge Wardlaw's order set aside. A supplemental bill, *Mars* vs. *Conner & Corley*, was filed 13th April, 1867, making Welch and the two McCelveys, Hugh and William, parties, to which, 4th June, 1867, an order *pro confesso* was taken as to William

McCelvey. At the June Term of Equity, 1867, Chancellor Lesesne, in both the cases, *McCelvey* vs. *McCelvey*, and *Mars* vs. *Conner & Corley*, by order, confirmed the Commissioner's report marshaling the assets, (in which the large judgment of Conner & Corley was reduced to $358,) and directed the sale of the lands for cash, the proceeds of the Clay tract still to await the issue at law. In pursuance of this order the Commissioner in Equity, William H. Parker, one of the defendants herein, sold at public outcry, 7th October, 1867, the lands, the Clay and Wells tracts, to Thomas Thomson, a defendant also herein, at the price of $1,820, (the Clay tract at $920); the price of the Wells tract, ($900,) was paid at once, but the proceeds of the sale of the Clay tract having to await the further order of the Court, the Commissioner, though he charged himself with the amount of the sale, did not collect it from Mr. Thomson until a future time. The sales were reported to the Court by the Commissioner, as was the custom of his office, by his books of sale. But said order, confirming this sale, if ever passed, was not produced, nor could be produced at the reference. The whole proceeds of sales, (including the personalty, sold by the Sheriff for $481.55, and turned over by him to the Commissioner,) amounting in gross to $2,301.55, have been applied as directed by the Court, by the Commissioner, to the payment of costs and fees and debts established against William McCelvey. William H. Parker, Commissioner in Equity, executed a deed for these lands, 19th November, 1868, to Mr. Thomson, who, on the same day, conveyed an interest of one-half therein to Parker, and they together, also on the same day, executed a deed for the lands, with warranty, to J. P. Reed and Daniel Brown, trustees, in consideration of the payment of $3,060.

The causes, *McCelvey* vs. *McCelvey*, and *Mars* vs. *Conner et al.*, were both marked "ended" on the docket, June Term, 1870. Some time in August, 1870, William McCelvey returned to this State, and very shortly thereafter instituted the proceedings in the first two actions stated in the caption of this report. In his complaint against Mars, he states that he had assigned his estate to this defendant for the benefit of his creditors; that the defendant had neglected his trusts; that the debt having been ascertained to be very trifling, compared to the assigned estate, the plaintiff was ready and able to pay them off, and consequently that there remained no necessity for carrying out the terms of the

assignment, and he prays that the assignment may be canceled; that Mars may be made to account for the administration of his effects; that a Referee for that purpose may be appointed; that the creditors may be called in, the estate marshaled and the balance paid to the plaintiff. Mars, answering, says that within a few days after the assignment was executed, Conner & Corley levied their executions upon the property of the plaintiff, with the intent to sell, and he, the assignee, filed his bill to enjoin them; that the Court of Equity enjoined these creditors from selling the realty, (the personalty was sold by the Sheriff, and never came to the hands of the assignee,) and ordered the lands to be sold by the Commissioner, the creditors to be called in, and the assignee to account before the Commissioner, and to surrender and pay over to that officer such property and funds as might be in his hands as assignee; and that, having once accounted before a Court of competent jurisdiction, he ought not to be required to answer again for the same subject matter. This branch of the matters in controversy may be disposed of here, at the hearing before the Referee. The parties did not require Mars formally to account, as it was known that he had turned over to the Commissioner in Equity all the property, choses in action, etc., in his hands, except $100, which he received for the sale of a gin, this amount being all the cash he had ever received; and as he had retained no commissions on his accounting before the Commissioner, it was conceded that he should keep the $100 as some sort of compensation for the expense incurred by him in the administration of the assigned estate. The cause stated second in the caption hereof will now be considered. The plaintiff, in his complaint against Thomson and Parker, sets forth that on the 7th of October, 1867, Thomas Thomson, Esq., at that time a practicing attorney at law and solicitor in equity, and his co-defendant, William H. Parker, Esq., being then Commissioner in Equity for Abbeville District, contrived together to defraud, and did defraud, the plaintiff of a large sum of money in this wise: The lands of the plaintiff, consisting of the Wells and Clay tracts, were offered for sale on that day by order of the Court of Equity, as before stated. Mr. Thomson became the bidder, at the price of $1,820, contrary to his known duty as solicitor to do so. The lands were knocked down to him at that bid, with the knowledge, connivance and acquiescence of Parker, Commissioner, conducting the sale; and that he, Thomson, did not comply with

the terms of sale until he had sold the lands to other parties at a great profit to himself and the said Commissioner; that Parker conveyed the lands so bid off 7th October, 1867, to Thomson, on the 19th November, 1868, at which time Thomson conveyed one-half interest to Parker, and that on the same day they jointly conveyed the said lands to Reed and Brown, for the sum of $3,060, being a profit of $1,240.  The defendant, Thomson, admits in his answer the purchase by him, the sale of one-half interest to Parker, and the joint conveyance with Parker of the lands to Reed and Brown, as stated in the complaint, but denies that he was at any time solicitor for the plaintiff, and also that there was any complicity whatever between himself and his co-defendant, Parker, in relation to the purchase of the land at the sale of the Commissioner.  The defendant, Parker, denies that there was any agreement or understanding between them as to the purchase of the land, stating that he did not bid himself, had no intention of becoming a bidder, and was not sure that Mr. Thomson intended to do so, though it was not imagined that he, Thomson, could be excluded from the right to purchase.  The facts elicited from the pleadings and from the testimony, of which a transcript accompanies this report, show conclusively to the Referee that there was no combination between the parties defendant in relation to the sale. On the contrary, the proof is that each labored to make the lands sell well, and the sale was fairly conducted.  The question then arises, first, is the Commissioner forever forbidden to purchase property which has once been sold by him officially? and, second, could Mr. Thomson, under the circumstances, become a purchaser at the sale mentioned?  As to the first question, suppose, for argument sake, the Commissioner himself is the highest bidder at a sale made by him, is the sale absolutely void or voidable only at a time when the Court of Equity of South Carolina was in its perfection, and the chancery bench of this State was not far, if at all, surpassed by any forum in the civilized world?  Permission has been granted, in the very order directing sales, to the Commissioner to become a bidder, under peculiar circumstances, at a sale made by him; and under the same circumstances the Court would confirm a purchase made without permission first obtained under that sound, equitable doctrine of considering things done which should have been done. It sometimes happens that the officer of the Court conducting sales is an heir at law to the estate he is selling, and the property, for

some reason or other,—such as that it was his birth-place or was the happy home of his childhood—is very desirable to him; is there any Court of justice which would forbid him to purchase it? It may be said that, being a distributee, it would, in the case supposed, be to his interest to make the sales as profitable as possible, and for that reason his fitness to conduct the sale would be the greater. But that is no answer to the fact that he would desire also to purchase the property at as cheap a price as it could be obtained; and yet there is no question, unless fraud could be shown, that the Court would confirm a sale made under such circumstances. Where, then, is the impropriety of his buying from a former purchaser, even after his connection with the sale by the Court had ceased? Is every subsequent purchaser of a tract land which was once sold by order of the Court of Equity to be charged with combining with the first purchaser to chill the sale? or is the Commissioner alone to be suspected of it if he afterwards became the owner of the land? Mr. Parker sold the land as directed by the Court. The proof is that he labored to induce persons to bid and that nothing unfair appeared at the biddings; the lands sold well—some of the bidders testified for more than they felt willing to give for them. The sales were reported to the Court by the Commissioner in the usual manner. Whether they were ever confirmed or not, does not appear; but that was no part of the Commissioner's duty. And here it is worthy of remark, if there had been any combination between the defendants, as is alleged, they would have been prompt to procure an order of confirmation. The purchase money, except that which was to await the further order of the Court, was promptly received and paid out by the Commissioner. A deed was not executed, however, until more than a twelvemonth after the sale. Again, it may be observed that if there had been improper confederation between the defendants, it seems there would have been some hurry in perfecting title, etc. The precise time at which Parker purchased the half interest from Thomson was not shown; but it is in proof they jointly rented the lands to one Carter for the year 1868. The transfer by deed was delayed, however, until 19th November, 1868, the day on which the Commissioner conveyed to Thomson, and the same day, too, on which they jointly conveyed to Reed and Brown. The profit made by these defendants on their joint sale is accounted for by the fact that they conveyed to Reed and Brown with warranty

against the contingent right of dower in the wife of the plaintiff, and also the claims of title in the land set up by Welch, which, after the purchase by Thomson, had been satisfied or arranged. There is nothing in the whole transfer to show any fraud on the part of the Commissioner, or of his cognizance of a fraud connected with the sale of the plaintiff's estate. Now, as to the propriety of Mr. Thomson becoming a purchaser at the sale : The interests of a client in the hands of his counsel are sacred. An attorney, even for justice's sake, may not be allowed to divulge secrets made known to him by his client. No relation in life, in the comprehension of the law, is held so intimate and confidential. Hence the violation of such a trust is the more culpable. In this instance, however, Mr. Thomson was not counsel for the plaintiff, McCelvey. Indeed, in one of the cases under which this sale was ordered, he was opposed to William McCelvey, and in the other, though representing the assignee, he was not even constructively counsel for the plaintiff herein, for Mr. McGowan was acting for him with unrevoked authority, he, McCelvey, having been made, too, a party defendant to the bill by publication. But even had Mr. Thomson been directly the plaintiff's counsel, could he have been precluded from purchasing at the sale? Authorities without stint were cited in the argument before the Referee, mostly upon the powers and restrictions of agents generally, and very few of them on the relation of attorney and client. One case, of *Miles* vs. *Erwin*, (1 McC., 524,) relied upon by both plaintiff and defendant, considers this point probably the most thoroughly, and is a leading case in the subject. In that case, as in all the others that I can find, the bargain was made with the client, and not with an officer of the Court, by its order. It was there held that all contracts between attorney and client in relation to the property in litigation are not necessarily void on the ground of that relationship, (as would be with agents generally); but to render them so, it must appear that they were used to the prejudice of the client.—1 McC., 549. What are the facts here? Competitors at the sale testify that it was fairly conducted, and that Mr. Thomson gave fully as much as, in their judgment, the lands were worth. But to take the strongest view of the matter against the attorney, suppose such proof of the facts had here been introduced, and that the plaintiff were really the client of Mr. Thomson, was the procurement of the sale improper? It will hardly be contended that it was, for that

very person, the plaintiff herein, assigned his estate; and the Court, taking possession of his assets, also undertook the administration thereof, in the place of the assignee. The sale being ordered by the Court, the purposes of the bill were accomplished and the relation of client and attorney ceased, and the ˈattorney was then as much at liberty to bid as the client himself, or as any one else.

The petition *Ex parte William McCelvey*, in re *Mars, assignee*, vs. *Conner et al.*, remains only to be considered. The petition recites the facts mainly as they have been hereinbefore set forth, stating that the petitioner was a necessary party to the bill, and that without his being made so by proper process no action was valid as to him, and, consequently, under such circumstances, questions the propriety of an order for sale of his effects; that the petitioner finds his assigned estate misapplied and sacrificed, and his creditors unpaid, and he prays that the entry "ended" on the docket, as to the case of *Mars, assignee*, vs. *Conner et al.*, may be erased, and upon proper terms he may come in and have a rehearing of the causes; that the sale may be set aside, the deeds surrendered and canceled, and, if necessary, the land be sold and the proceeds disposed of according to law in settling his affairs in the assignment of his effects. To this it is replied by the defendant, and he is sustained by the proof, that he was really a party defendant in *McCelvey* vs. *McCelvey*, one of the cases in which the sale was ordered, and that, by order of Judge Wardlaw, leave was granted to make him a party in the other case, *Mars, assignee*, vs. *Conner et al.;* that after publication of notice, an order *pro confesso* was taken against him, and the defendants deny the rights of the petitioner, after a lapse of five years, to have the order "ended" rescinded, and the cause of *Mars* vs. *Conner* returned to the docket, and the order *pro confesso* set aside, for the purpose of contesting decrees regularly made by the Court in accordance with his assignment, under which important rights have vested. This brings up a question or two not hereinbefore considered: Whether or not, for the purposes of the bill in *Mars* vs. *Conner et al.*, William McCelvey was a necessary party, is not a matter for the Referee now. McCelvey insists that he should have been, and the fact is he was made so by a competent order. A notice was published requiring him to answer, and upon his default an order *pro confesso* was taken against him. It is objected that publication against him was irregular, because his absence was not made known by the usual affidavit.—1 Brev. Dig., Title LVII,

§ 23, 203.   The practice of the Court of Equity was to require per-
sonal service of its process, and this could not be dispensed with,
except upon satisfactory proof of the absence of the party beyond
the limits of the State.   The statute suggests an affidavit of the fact
upon which to found the order to publish.   This is to the satisfac-
tion of the Court; but if by any other means the Court is entirely
satisfied of the fact, the affidavit is unnecessary.   Here the fact of
the plaintiff's absence beyond the reach of the process of the Court
is not only not contradicted, but positively asserted by the peti-
tioner himself.   If the publication was irregular, the irregularity
was healed by the confirmation of the fact which an affidavit could
only set forth; so that he was made a party to the bill, and the
*pro confesso* order was well taken.   It is my opinion, however, that
the cause was not ended when it was so marked on the docket.
The sale made by the Commissioner seems never to have been con-
firmed.   Without confirmation of the sale, where is the title of pur-
chasers?   The deed executed by the Commissioner is only evidence
of title.   The order of the Court confirming the contract with the
purchasers is the title, and is necessary to the completion of the
purchase.   In this instance, the sale being for cash, the Court
ordered deeds to be executed upon compliance with the terms of
sale; so that it may be this order is a confirmation in anticipation,
and there may be no necessity to open the case; and as the party
whose interests are affected by it are not seeking it, I do not recom-
mend such a course.

Having stated very fully the issues in these causes which were
referred to me, I would respectfully report:

I find as matters of fact—

1. That the plaintiff, on the 20th of August, 1866, executed a
voluntary assignment of his whole estate to the defendant, William
D. Mars, for the benefit of his creditors.

2. That in pursuance of proceedings had in the Court of Equity
for Abbeville District, the assignee fully accounts before that Court,
and surrendered the assigned estate to the Court for proper admin-
istration.

3. That the Court ordered the sale of the real estate by the Com-
missioner at public outcry; in pursuance of which order the defend-
ant, William H. Parker, then the Commissioner, in plain and open
market, on the 7th of October, 1867, sold the said lands to Thomas

Thomson, the defendant, at the price of $1,820, the highest offered, conducting the sale fairly, and exerting himself, as was his duty, to make the sale as profitable as possible to the parties in interest.

4. That the defendant, Thomas Thomson, was not, at the time of said purchase, attorney or solicitor for the plaintiff, directly or constructively; that there was no effort on his part to chill the sale, but that, on the contrary, he induced others to compete with him at the biddings.

5. That there was no attempt to defraud or injure the plaintiff, nor was he defrauded or injured, either on the part of William H. Parker or Thomas Thomson, in the purchase by the latter, or his subsequent conveyance to the former of a half interest therein, or their joint conveyance of the whole interest to Reed and Brown at the advanced price of $3.060.

And I find as matters of law—

1. That the plaintiff, William McCelvey, was legally made a party to the bill, *Mars* vs. *Corley et al.*, and bound by all proceedings had therein.

2. That the defendant, William D. Mars, assignee of the plaintiff's estate, having accounted for and surrendered the assigned estate, under an order of a Court having jurisdiction thereof, is no longer liable to a further accounting.

3. That the defendant, Thomas Thomson, had the right to become a purchaser at the sale in question; that the sale to him was valid, and that he had the legal right to convey the lands, with profit to himself, to whomsoever he chose.

4. That the defendant, William H. Parker, after the sale had been completely made by him, without fraud, was not prevented from subsequently purchasing an interest in the lands, and that he had the right to do so as fully as if he had never had anything to do with the sale as an officer of the Court.

5. That the joint sale of the lands by Thomson and Parker to Jacob P. Reed and Daniel Brown, trustees, was valid.

And I would respectfully recommend that all the proceedings in the different causes herein referred be dismissed.

On behalf of the plaintiff, William McCelvey, exceptions were filed to the above report, on the following grounds:

1. That the Referee failed to find that the defendants, Thomas Thomson and W. H. Parker, acted in a fiduciary capacity at the sale of the plaintiff's property in the year 1867.

2. That the Referee erred in not finding fraud and collusion of fraud on the part of Thomas Thomson and W. H. Parker, then Commissioner in Equity, in purchasing the property in question.

3. Because the Referee found, and erred in finding, that the plaintiff had been legally made a party to the bill in *Mars* vs. *Corley et al.*

4. Because the Referee erred in finding that Thomas Thomson, the defendant, had a right to purchase at the said sale, when it is respectfully submitted that he was acting in a fiduciary capacity of atttorney and client at the said sale, and that any and all benefit received by him from said sale should enure to the benefit of his client.

5. Because the Referee erred in finding that W. H. Parker had a right to purchase the said property, when it is submitted that it appears from the evidence that the said Parker, then Commissioner in Equity, confederated with the said Thomson in the purchase of the said land and participated in the profits thereof.

6. Because, in other respects, the report is contrary to the law and the evidence.

The decree of the Circuit Court is as follows:

COOKE, J.   The report of the Referee, Silas Johnstone, Esq., in the above stated cases, and the exceptions thereto, having been read, and argument heard, on motion of McGowan, it is ordered that the exceptions be overruled and the report confirmed and be made the judgment of this Court.

The plaintiff appealed.

*Monteith & Bauskett*, for appellants:

William H. Parker being Commissioner in Equity and Thomas Thomson as Solicitor in Equity, were, on general grounds, prevented from purchasing.—*Fox* vs. *Mackreth*, 1 Lead. Eq. Cases, 197; *Ex parte Lacey*, 6 Ves., 629; *Ex parte Bennett*, 10 Ves., 381, 400.

Thomson, as solicitor for assignee, could not buy to his own advantage.—*Whitcomb* vs. *Minchin*, 5 Mad., 91; *Galbraith* vs. *Elder*, 8 Watts, 81, 94, 100; *Henry* vs. *Raimon*, 1 Casey, 354, 360.

The doctrine which is applicable to purchase by trustees applies also to all purchases by persons acting in a fiduciary capacity, which imposes upon them the obligation of obtaining the best terms for the vendor, or which has enabled them to acquire a knowledge of the property.

A solicitor having under a decree the conduct of a sale is under an absolute incapacity to purchase at it.—*Atkins* vs. *Delmeze,* 12 Jr. Eq. Rep., 1.

Assignees of a bankrupt cannot purchase.—See numerous authorities cited in 1 Lead. Eq. Cases, * 133, 201, 3d Am. ed.

Commissioners specially forbidden by statutes.—7 Stat., 263, § 8.

*McGowan,* contra.

April 20, 1876.　The opinion of the Court was delivered by

WRIGHT, A. J.　The three cases above stated, from their reference together for a hearing and determination of the issues they involve, would appear to embrace the same subject matter upon which, by appeal, the judgment of this Court is asked to correct the errors alleged in the conclusions of the Judge below confirming the report of the Referee.

We shall not attempt to encumber our opinion with a recital of the facts which may be necessary to a proper understanding of the grounds upon which the petitioner seeks relief.　They are fully set forth in the report in the proper order as to dates, and their statement will be accepted as accurate, though we may not agree with the conclusions which the Referee draws from them.　The cause first stated in the caption seems to have been disposed of at the reference, and is not open to consideration here by any exception in regard to it.　Indeed the points to be reviewed on the motion of the appellant are in no wise affected by the determination of any question which arose under it.

The cases secondly and thirdly stated may be considered together. The first of these assails the purchase at the sale of the Commissioner, under the order of the Court, in the cases of both *Hugh McCelvey* vs. *William McCelvey,* and *Mars, assignee,* vs. *Conner, Corley et al.,* and claims judgment against Thomson and Parker for $2,700, with interest from 7th October, 1867, and costs of suit. The petition, *Ex parte McCelvey, in re Mars, assignee,* vs. *Conner et al.,* (the third

in the heading,) recites the facts stated in the other case, already referred to, alleges that petitioner was a necessary party thereto, questions the propriety of the sale of the land assigned by him to Mars for the benefit of his creditors, prays that the entry of "ended" on the docket as to the case of *Mars, assignee*, vs. *Conner et al.*, may be erased, that a rehearing of the causes may be had, the sale set aside, the deed surrendered and canceled, and, if necessary, the lands resold and proceeds disposed of under the assignment according to law. Without noticing the inconsistency of the relief sought through the bill against Thomson and Parker, and the petition *In re Mars, assignee*, vs. *Conner et al.*, the one claiming a compensation in money for any wrong committed by Parker and Thomson in the sale and purchase of the lands, and the other that the case may be restored to the docket, a rehearing had, the sale set aside, and the deeds ordered to be canceled, it is enough to say that the petitioner was duly made a party to the bill of *Mars* vs. *Conner et al.* The order therefor was by one of the Associate Justices, under the authority of the Act of 1859, (12 Statutes at Large, 757,) and the judgment *pro confesso* properly entered.

Neither is he entitled to a rehearing of so much of the merits of the case as terminated in the order made on June 12, 1867, for a sale of the lands. He was a party to the proceeding; the order constituted a final judgment acting directly on the property the subject of the suit; and though the appellant was allowed by the statute of 1784, (7 Statutes at Large, 210,) if absent from the State and within the United States, two years to appear in Court, and petition to be heard in "relation to the matter of such decree, and such proceedings shall be had, &c., as if no former decree had been made in the said cause," he failed to avail himself of a privilege, by the exercise of which he would have had the opportunity of contesting the propriety of the sale of his property.

While we do not regard the cause as "ended," when the entry to that effect was made by the Chancellor, for objection to the confirmation of the sale may have been made by any one interested on the coming in of the report upon it, yet the petitioner cannot have the decree for the sale set aside, because, a party to the bill when it was ordered, he did not move to contest it within the time permitted by the statute. It by no means, however, follows because a party affected by a judicial sale may be precluded from coming in and contesting either its necessity and propriety, that he is prohibited

from seeking relief against it on the ground either of fraud in equitable combination or undue influence. While, therefore, the appellant may not be permitted to aver against the title by which the land is held by its present owners, he may be allowed, on the equitable principles which regulate the action of those standing in a fiduciary relation, to know that a profit to which he is entitled has enured to the benefit of others who, by the position in which they stood to him, could be considered only as agents or trustees and in the particular transaction could not acquire a benefit to his prejudice. It is proper and necessary to consider the position which Mr. Thomson occupied at the time of the sale, which was ordered under the case of *Hugh McCelvey* vs. *William McCelvey*, as well as that of *W. R. Mars, assignee*, vs. *A. P. Conner et al.* In the first he was the solicitor of the plaintiff, in the language of his own answer to the complaint, here "employed to file the bill of said Hugh McCelvey for the purpose of selling this Clay land." In the bill of *Mars, assignee*, vs. *Callet and Conner et al.*, he was the solicitor of record for the plaintiffs to enjoin a sale of the assignee's property under execution, and to marshal the assets of Wm. McCelvey, to whom, by the terms of the assignment, was reserved the interest in any overplus after the purposes proposed by the instrument had been accomplished. In the statement of facts furnished by the brief, it appears that on November 7, 1866, Associate Justice Wardlaw made an order for the sale of the lands, which resulted in their being knocked off to Mr. Thomson for $2,800, but in December, 1866, (the precise day is not mentioned,) the sale was set aside on the action of one Welch. On June 12, 1867, the order for the sale under both cases was again made, terms cash, and on October 7, 1867, the sale took place, Mr. Thomson being the highest bidder for the Clay tract, $920, the Wells tract, $900. The bid for the last named piece was paid, but, in the language of the Referee, " the proceeds of the sale of the Clay tract having to await the further order of the Court, the Commissioner (Mr. Parker,) though he charged himself with the amount of the sale, did not collect from Mr. Thomson until a future time." No report of the sale was ever made to the Court. ' The bid for the Clay tract ($920) was not paid until the 19th of November, 1868, when the title was executed to Mr. Thomson, and he, on the same day, transferred by deed a one-half interest in both places to Mr. Parker, and the two on the same day, in consideration of $3,060, sold and

conveyed the whole to Brown and Reid on certain trusts. Thomson, it will be remembered, purchased on October 7, 1867. When he agreed to sell the one-half interest to Parker does not appear, but it is in the proof that they jointly rented it to one Carter for the year 1868. It is proper not to omit a statement by the Referee in his report, to wit: "The profit made by these defendants in their joint sale is accounted for by the fact that they conveyed to Reid and Brown, with warranty against the contingent right of dower in the wife of the plaintiff, and also the claims of title in the lands set up by Welch, which after the purchase by Thomson has been satisfied or arranged." To what extent this claim was asserted, or how arranged, did not appear. It is a matter of satisfaction to the Court that there is nothing in the evidence which can subject these defendants to the charge of actual or positive fraud, with which they have been assailed in the transaction out of which this contest has arisen. There is no testimony to show a combination to obtain a profit or advantage at the sacrifice of the obligation which they relatively owed to the plaintiff, McCelvey, by any direct agreement to that end. They must, nevertheless, be held amenable to the principle of equity, which, while it recognizes the absence of all moral delinquency, yet regards the transaction liable to imputation, because, in the language of Mr. Story, "contrary to some general public policy, or to some fixed artificial policy of the law, or growing out of some special confidential or fiduciary relation between all the parties, or between some of them, which is watched with special jealousy and solicitude, because it affords the power and means of taking undue advantage, or of exercising undue influence over others."

Mr. Parker was the Commissioner in Equity who made the sale. By the Act of 1791, (7th General Statutes, 263,) he was prohibited from being concerned or interested, directly or indirectly, in the purchase or acquisition of any property sold by him. If his acts here do not bring him within the letter of the prohibition, they certainly include him within its spirit. The terms of the sale were cash, the bid was $1,820, of which $900 was paid at the time, October 7th, 1867, and the balance not until 19th November, 1868, the very day on which the purchaser conveyed a half interest to him. Although the sale was not perfected by the payment of the whole purchase money and the execution of a deed for some time, yet very soon after the lands had been knocked off to Mr. Thomson,

and so entered on the sale book, Mr. Parker seems to have acquired an interest in them, for he with Mr. Thomson rented them to Carter for the year 1868. The payment of the remaining portion of the bid was made to Mr. Parker on the 19th of November, 1868, and he thus acquired a credit on his own purchase of over a year through the very credit which he had extended to Mr. Thomson. If it had been announced at the sale that a credit of one-half of the purchase money (and that too without interest) would be given for a year, who can say there may not have been a bid overreaching that made by the party who was entered as the purchaser? It is urged that, although Mr. Thomson represents the assignee of the appellant in the case of *Mars* vs. *Conner et al.*, the sale was made not only under that case, but conjointly with the case of *Hugh McCelvey* vs. *William McCelvey*, in which Mr. Thomson represented the plaintiff, the bill in the last named cause praying specific performance of a contract in relation to one of the very tracts sold. It may be assumed as certain that his position as solicitor in the two suits did not detract from the influence which he might have exercised at the sale had he been but the solicitor in one of them. The ground assumed in his behalf as representing only the assignee, and not William McCelvy, the assignor, cannot be maintained. While it is true that the assignee held the property subject to the provisions of the assignment, they were to be enforced under the terms which the assignor had directed and prescribed for the government of his assignee. The relation which the assignee occupied was one of trust, not only as regards the creditor, but also in relation to the assignor, who, besides his general interest in the proper administration of the trust conferred, had a direct interest in so much of the property conveyed as might remain after its appropriation to the purposes directed by the assignment. When Mr. Thomson therefore represented the assignee, he at the same time was bound to protect the interest of the assignor to any rights to which he may have been entitled under the instrument. His reception of a fee out of the assigned effects is indicative of the connection in which he stood to William McCelvy in the case. A fiduciary relation existed between Thomson and Parker on one hand and McCelvey on the other. The one was the solicitor, the other the officer making the sale, and they must both be regarded as his agents in the course of its conduct. While we see no actual fraud in the circumstance attending the sale and

resale, yet the transaction cannot be sustained when subject to and tested by the principles of equity, which are so concisely and tersely stated by Judge Story in the language to which we have already referred. They are recognized in the cases in our own Courts, where questions arising out of the rights and obligations of trustees and *cestuis que trust* have been discussed and determined, and they are so well and plainly expressed by Chancellor Walworth, in *Terry* vs. *Bank of Orleans,* (9 Paige, 662,) as to render unnecessary a citation of other authorities. He says: "It is a settled principle of equity that no person who is placed in a situation of trust or confidence in reference to the subject of sale can be a purchaser of the property on his own account; and in the recent case (*Treenlaw* vs. *Kind*) decided in the Court of Chancery in England, in January, 1841, (5 Law Journal, 18,) Lord Cottenham held that the principle was not confined to a particular class of persons, such as guardians, trustees or solicitors, but was a rule of universal application to all persons coming within its principle, which is that no party can be permitted to purchase an interest where he has a duty to perform that is inconsistent with the character of purchaser."

Another point remains to be considered. Although the appellant did not apply within two years from the date of this order for sale for leave to come in and contest its necessity or propriety with the purpose of setting it aside, he is within the proper time for asking that the entry of "ended" in the case of *Mars* vs. *Conner et al.,* should be struck out, and he be permitted to come in and claim whatever rights he may be entitled to under his assignment. The entry was made June 30, 1870, and the petition for leave to appear was filed January 29, 1872. The two years fixed by the statute had not expired.

The sale to Reed and Brown must stand. In addition to the reasons already given, they were *bona fide* purchasers for valuable consideration, and not affected with notice of any equity on the part of McCelvey sufficient to overreach legal title. Parker and Thomson must be held liable to account to William McCelvey for $1,240, that difference between the amount at which they purchased the land and the price at which they sold it, with interest from the 19th of November, 1868. The costs under the petition must be paid by William McCelvey, and the costs in *William McCelvey* vs. *Thomson and Parker* by the respective parties on whose several behalf they were incurred.

The case is remanded to the Circuit Court for Abbeville County, with leave to the parties to move for such orders as may be necessary and proper to give effect to the views and principles herein announced.

*Moses,* C. J., and *Willard,* A. J., concurred.